## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN DOE,                                           )
                                                    )
                                                    )
                                                    )
                                                    )
                            **Plaintiff,**          )          Civil Action No. 25-1371
                                                    )
            v.                                      )       **JURY TRIAL DEMANDED**
                                                    )
CAMRYN SIMONS,                                      )
CHRISTOPHER HINSON,                                 )
MADELINE PRATT,                                     )
COMPUTER SCIENCE CLUB AT PITT,                      )
MACKENZIE BALL,                                     )        **FILED**
ROBERT FISHEL,                                      )
DaVAUGHN VINCENT-BRYAN,                             )        DEC 0 5 2025
DONALD SHIELDS,                                     )
CLYDE PICKETT,                                      )      CLERK U.S. DISTRICT COURT
and                                                 )      WEST DIST OF PENNSYLVANIA
UNIVERSITY OF PITTSBURGH                            )
                                                    )
                                                    )
                            **Defendants.**         )
                                                    )

### AMENDED COMPLAINT

Plaintiff, John Doe, by himself, hereby files this Amended Complaint and alleges as

follows:

### THE PARTIES

1.    Plaintiff, JOHN DOE ("Plaintiff"), is an adult individual resident of the

Commonwealth of Pennsylvania and was, from August 2019 to December 2024, a full-time

student at the University of Pittsburgh ("Pitt" or the "University") and at all relevant times a

member of the Computer Science Club at Pitt ("CSC"). Plaintiff proceeds under a pseudonym in

this action to protect his privacy and safety. Plaintiff's true name and address is on file with the Court and may be provided under seal upon request.

2.      Defendant, CAMRYN SIMONS, is an adult individual resident of the Commonwealth of Pennsylvania and was at all relevant times a member of the Computer Science Club at Pitt. Mx. Simons, who identifies as nonbinary and uses they/them pronouns, currently resides in the area of Pittsburgh, Pennsylvania.

3.      Defendant, CHRISTOPHER HINSON, is an adult individual resident of the State of California and was at all relevant times a full-time student at the University of Pittsburgh and a member of the Computer Science Club at Pitt. Mx. Hinson, who identifies as nonbinary and uses they/them pronouns, currently resides in the San Francisco Bay Area of California.

4.      Defendant, MADELINE PRATT, is an adult individual resident of the Commonwealth of Pennsylvania and was at all relevant times a member of the Computer Science Club at Pitt either actively enrolled in or on an official leave of absence from a doctoral program at the University of Pittsburgh. Ms. Pratt currently resides in the area of Pittsburgh, Pennsylvania.

5.      Defendant, COMPUTER SCIENCE CLUB AT PITT, is an unincorporated association and Registered Student Organization ("RSO") at the University of Pittsburgh in Pittsburgh, Pennsylvania whose stated mission is "[t]o help create an engaging atmosphere for students to learn more about the field of computer science and develop professionally." As a Registered Student Organization at Pitt, CSC is bound by the University's Student Code of Conduct as well as the University's Registered Student Organizations Handbook.

6.      Defendant, MACKENZIE BALL, is an adult individual resident of the Commonwealth of Pennsylvania and a full-time staff member of the University who was at all

relevant times the Computer Science Club at Pitt's faculty advisor ("Advisor"). As a full-time staff member of the University, Advisor Ball is both a Responsible Employee and Mandatory Reporter under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"). Advisor Ball maintains a professional mailing address at 5815 Sennott Square, 3810 Forbes Avenue, Pittsburgh, Pennsylvania 15213.

7.      Defendant, ROBERT FISHEL, is an adult individual resident of the State of Massachusetts and was at all relevant times a full-time student at the University of Pittsburgh who served as the President of the Computer Science Club at Pitt ("President"). Additionally, President Fishel was at all relevant times employed as a Peer Tutor by the University of Pittsburgh's School of Computing and Information, a capacity in which he was both a Responsible Employee and Mandatory Reporter under Title IX. President Fishel currently resides in the area of Boston, Massachusetts.

8.      Defendant, DaVAUGHN VINCENT-BRYAN, is an adult individual resident of the Commonwealth of Pennsylvania and was at all relevant times the Director of the Student Organization Resource Center ("SORC") at Pitt ("Director"). As a full-time staff member of the University, Director Vincent-Bryan is both a Responsible Employee and Mandatory Reporter under Title IX. Director Vincent-Bryan maintains a professional mailing address at 125 William Pitt Union, 3959 Fifth Avenue, Pittsburgh, Pennsylvania 15260.

9.      Defendant, DONALD SHIELDS, is an adult individual resident of the Commonwealth of Pennsylvania and was at all relevant times the Associate Dean for External Relations ("Dean") for the University of Pittsburgh's School of Computing and Information ("SCI") and Defendant Ball's direct supervisor. As a full-time staff member of the University, Dean Shields is both a Responsible Employee and Mandatory Reporter under Title IX. Dean

Shields maintains a professional mailing address at 5401 Sennott Square, 3810 Forbes Avenue, Pittsburgh, Pennsylvania 15213.

10.    Defendant, CLYDE PICKETT, is an adult individual resident of the Commonwealth of Pennsylvania and was at all relevant times the University of Pittsburgh's Chief Diversity Officer and Vice Chancellor for Equity, Diversity, and Inclusion, a position which has since been renamed to Vice Chancellor for Institutional Engagement and Wellbeing ("Vice Chancellor"). As a full-time staff member of the University, Vice Chancellor Pickett is both a Responsible Employee and Mandatory Reporter under Title IX. Vice Chancellor Pickett maintains a professional mailing address at 3100 Cathedral of Learning, 4200 Fifth Avenue, Pittsburgh, Pennsylvania 15260.

11.    Defendant, UNIVERSITY OF PITTSBURGH, is a public, state-related research university organized under the laws of the Commonwealth of Pennsylvania. The University receives federal financial assistance and is subject to Title IX of the Education Amendments of 1972. Pursuant to the *University of Pittsburgh—Commonwealth Act*, Act of July 28, 1966, 3d Spec. Sess., P.L. 87, No. 3, 24 P.S. § 2510-201 *et seq.*, the University of Pittsburgh constitutes an instrumentality of the Commonwealth of Pennsylvania and is considered a state actor for purposes of federal claims. The University maintains an address at 4200 Fifth Avenue, Pittsburgh, Pennsylvania 15260.

## JURISDICTION AND NATURE OF ACTION

12.    This is a civil action seeking monetary damages, declaratory relief, and injunctive relief. Plaintiff asserts claims against the University of Pittsburgh under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*) for sex discrimination; against the Computer Science Club at Pitt, Mackenzie Ball, and Clyde Pickett under 42 U.S.C. § 1983 for violating

Plaintiff's Equal Protection rights under the Fourteenth Amendment; against the Computer

Science Club at Pitt, its advisor Mackenzie Ball, and Advisor Ball's supervisor, Donald Shields,

under 42 U.S.C. § 1983 for violating Plaintiff's First Amendment rights; against Camryn

Simons, Christopher Hinson, Madeline Pratt, and Mackenzie Ball for Intentional Infliction of

Emotional Distress (IIED); and against Robert Fishel, Mackenzie Ball, DaVaughn Vincent-

Bryan, Donald Shields, and Clyde Pickett for Negligent Infliction of Emotional Distress (NIED).

13.    This Court has original jurisdiction over Plaintiff's federal claims under 28 U.S.C.

§§ 1331 and 1343 because Plaintiff's claims arise under the laws of the United States, and

supplemental jurisdiction over Plaintiff's state-law claims (including IIED and NIED) under 28

U.S.C. § 1367 because the state claims arise out of the same nucleus of operative facts as the

federal claims.

14.    This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C.

§§1391(b)(1) and 1391(b)(2) because the events and actions complained of took place in this

judicial district and the Defendants were present and conducted affairs in this judicial district at

all relevant times.

## RELEVANT LAWS AND POLICIES

15.    Title IX of the Education Amendments of 1972 reads, in pertinent part, "No

person in the United States shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance."

16.    *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) establishes that

an educational institution which receives federal funds can be held liable for monetary damages

under Title IX when the institution has actual knowledge of sex-based harassment that occurs

5

within its jurisdiction, acts with deliberate indifference towards that harassment, and the harassment is so severe, pervasive, and objectively offensive as to deprive a victim of access to educational opportunities or benefits.

17.     The Fourteenth Amendment to the United States Constitution reads, in pertinent part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

18.     The First Amendment of the United States Constitution reads, in pertinent part, "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

19.     *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc), *et al.* establish that when a government actor takes adverse or disciplinary action against a private citizen for engaging in protected speech that would have a chilling effect on or otherwise deter a person of ordinary firmness from engaging in such speech, this constitutes illegal First Amendment retaliation.

20.     In supplement to the *University of Pittsburgh—Commonwealth Act* of 1966, *Braden v. Univ. of Pittsburgh*, 552 F.2d 948 (3d Cir. 1977) (en banc), *Krynicky v. University of Pittsburgh*, 742 F.2d 94 (3d Cir. 1984), *et al.* establish that the University of Pittsburgh constitutes an arm of the state of Pennsylvania and is thus considered a government actor for purposes of federal claims.

21.    *Stanley v. Georgia*, 394 U.S. 557 (1969), *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969), *Board of Education v. Pico*, 457 U.S. 853 (1982), *et al.* establish that the First Amendment protects not only the right to *express* ideas and opinions (speakers' rights), but also the right to *receive* information and ideas and to hear competing viewpoints (listeners' rights).

22.    Article I, Section 7 of the Pennsylvania Constitution reads, in relevant part, "[T]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject..."

23.    Title 42, Section 1983 of the United States Code reads, in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."

24.    The University of Pittsburgh's Nondiscrimination Policy states that "[t]he University of Pittsburgh, as an educational institution and as an employer, values equality of opportunity, human dignity, and racial/ethnic and cultural diversity. Accordingly, the University prohibits and will not engage in discrimination or harassment on the basis of race, color, religion, national origin, ancestry, sex, age, marital status, familial status, sexual orientation, gender identity and expression, genetic information, disability, or status as a veteran."

25.    The University of Pittsburgh's Student Code of Conduct guarantees that all University students have the right "[t]o engage in discussion, to make inquiries, to exchange thought and opinion, to publish and exchange findings and recommendations, to speak, write, or print freely on any subject, and to sponsor speakers of their choice, in accordance with the

guarantees of our Federal and State Constitutions, subject only to the right of the University to make reasonable rules and regulations related thereto."

26.    The University's Student Code of Conduct also guarantees that Students have the right "[t]o be free from discrimination on the basis of race, color, religion, national origin, ancestry, sex, age, marital status, familial status, sexual orientation, gender identity and expression, genetic information, disability, or status as a veteran."

27.    The University's Registered Student Organization Handbook requires that all RSOs "[a]dhere to University policies and procedures and local, state and federal laws" and notes that "[a]ny violation of this Handbook may result in disciplinary action in accordance with the Student Code of Conduct."

28.    The Computer Science Club at Pitt's code of conduct begins by noting that "We are committed to providing a welcoming and inspiring community for all and expect our code of conduct to be honored. Anyone who violates this code of conduct may be banned from the community."

29.    The CSC code of conduct goes on to stipulate that club members must "Be respectful: Not all of us will agree all the time, but disagreement is no excuse for poor behavior and poor manners. We might all experience some frustration now and then, but we cannot allow that frustration to turn into a personal attack. . . . Be careful in the words that we choose: We are a community of professionals, and we conduct ourselves professionally. Be kind to others. Do not insult or put down other participants. Harassment and other exclusionary behavior aren't acceptable."

30.    The CSC code of conduct defines "harassment" as follows: "Harassment includes, but is not limited to: Offensive comments related to gender, gender identity and expression,

sexual orientation, disability, mental illness . . . Sustained disruption of discussion . . . Publication of non-harassing private communication," *inter alia*.

31.    However, the CSC code of conduct also goes on to note that "Our community prioritizes marginalized people's safety over privileged people's comfort. We will not act on complaints regarding: 'Reverse' -isms, including 'reverse racism', 'reverse sexism', and 'cisphobia.'"[1]

## STATEMENT OF RELEVANT FACTS

32.    Beginning on June 4, 2023, CSC members Camryn Simons and Christopher Hinson, both of whom already had a long history of misconduct in CSC, began unprovokedly mocking and bullying Plaintiff in the club's Discord server.

33.    During the course of Mx. Simon and Mx. Hinson's bullying, a close friend and ally of theirs, Madeline Pratt (née Boby), joined the Discord server and joined Mx. Simons and Mx. Hinson in taunting Plaintiff.

34.    Upon information and belief, Ms. Pratt was recruited into the server by Mx. Hinson and/or Mx. Simons solely to help them bully Plaintiff.

35.    On June 11, 2023, the CSC officers privately issued Mx. Simons and Mx. Hinson conduct warnings for their treatment of Plaintiff.

36.    After these conduct warnings were issued to her friends, Ms. Pratt *publicly* objected to the warnings on the grounds that Plaintiff had made her feel "uncomfortable" in a private conversation that had taken place completely outside the context of the club on October 27, 2021, nearly two years earlier.

---

[1] Cf. the recent Supreme Court case *Ames v. Ohio Department of Youth Services,* 605 U.S. _ (2025) in which the Court unanimously ruled that "reverse discrimination" is illegal and does not require meeting a higher burden of proof than "forward" discrimination does.

37.     The private conversation in question was objectively inoffensive and had been explicitly solicited by Ms. Pratt, who, several years prior in a different Discord server, had publicly asked for advice about a personal matter she was dealing with

38.     By publishing this "non-harassing private communication," Ms. Pratt *herself* committed harassment of Plaintiff under the CSC code of conduct.

39.     Ms. Pratt proceeded to hijack the public CSC Discord (thus committing *further* harassment of Plaintiff as per the CSC code of conduct's prohibition on "sustained disruption of discussion") on June 11, 2023 to make her case that because of the nearly two-year-old conversation, Plaintiff was not someone whom the club should be protecting from bullying and harassment (i.e., that Plaintiff should not be afforded the same rights afforded to *all* Pitt students and CSC members).

40.     During the course of her tirade, Ms. Pratt described herself as "a woman speaking against the uncomfortable behaviors of a man," suggesting that her harassment of the male, cisgender Plaintiff was motivated at least in part by Plaintiff's sex.

41.     On August 24, 2023, more than two months after Ms. Pratt made her allegations against Plaintiff, CSC sent Plaintiff an email informing him that the officer team had decided to suspend him from the club's Discord server for a semester because of Ms. Pratt's alleged "discomfort" with the October 27, 2021 conversation, and Plaintiff was concomitantly removed from the Discord server and technologically barred from re-joining until January 8, 2024.

42.     The club's Discord server contains numerous facets related to furthering CSC's mission of "creat[ing] an engaging atmosphere for students to learn more about the field of computer science and develop professionally" which are not duplicated in the club's in-person

meetings or events,[2] including a "Leetcode Bootcamp" which helps students prepare for computer programming interviews conducted by tech companies, a forum for asking and answering academic and job-related questions, and channels dedicated to networking with other club members and alumni for career and research opportunities.

43.    As such, suspension from the Discord server meaningfully deprived Plaintiff of material educational benefits associated with CSC membership, and, by extension, full-time, degree-seeking enrollment at the University of Pittsburgh.[3]

44.    On August 25, 2023, Plaintiff questioned CSC President Robert Fishel ("President) and CSC Vice President Nathan Barta ("Vice President") about the grounds for his suspension, noting that CSC's Code of Conduct made no mention of "discomfort."

45.    Vice President Barta conceded that "[t]he code of conduct indeed does not contain the word 'discomfort,'"[4] before going on to make the bizarre statement that Plaintiff's suspension was for "breach of the code of conduct, not the substance of the accusations made against [Plaintiff]."

---

[2] Consider that Plaintiff secured his current employment by responding to a job advertisement posted in the CSC Discord by an alumnus and which was not duplicated outside the Discord server. Similarly, in addition to other methods by which he and other CSC members have "learn[ed] more about the field of computer science and develop[ed] professionally" through the Discord server, Plaintiff has personally witnessed several *other* CSC members obtain jobs, internships, and research positions through participation and networking in the Discord server.

[3] That the CSC Discord server constitutes an official club space and arm of CSC is further supported by the fact that the club's constitution explicitly states that "Membership in CSC . . . may be achieved through attendance at meetings and events, **communication on social media platforms**, and working on CSC projects" (emphasis added).

[4] Consider that a right-leaning CSC member might reasonably feel "uncomfortable" with a left-leaning CSC member publicly endorsing or expressing support for a left-wing political candidate, or vice versa, in the Discord; however, in addition to being constitutionally protected, such speech is objectively inoffensive and in no way violates the University's or CSC's code of conduct. Accordingly, there is no scenario in which sanctioning a club member based purely on accusations of subjective and unsubstantiated "discomfort" can be justified.

46.     Despite repeated inquiries from Plaintiff, neither President Fishel nor Vice President Barta would clarify in what way Plaintiff "breach[ed] . . . the code of conduct," and to this day Plaintiff does not know how the officers believe he did so.

47.     On August 26, 2023, after a monthslong period in which Plaintiff had been the victim of severe, unprovoked bullying from other CSC members as well as an unjustified suspension from CSC's Discord server that he knew would meaningfully deprive him of material educational benefits and opportunities, Plaintiff suffered a severe mental and emotional breakdown on campus which resulted in Pitt Police being summoned.

48.     The responding Pitt Police officers took Plaintiff to the nearby UPMC Western Psychiatric Hospital for a psychiatric evaluation, and Plaintiff subsequently began therapy sessions with the University Counseling Center ("UCC") at Pitt.

49.     On August 30, 2023, Plaintiff had a Zoom meeting with Advisor Ball and Vice President Barta to appeal his suspension.

50.     During this meeting, Advisor Ball was incredibly rude and condescending towards Plaintiff, sanctimoniously lecturing him that "actions have consequences" *a priori* of even learning the facts of the case; unsolicitedly expressing her personal opinions about the matter rather than simply acting as an objective judge or arbiter; and generally treating Plaintiff with the presumption of guilt rather than the presumption of innocence.

51.     On September 7, 2023, Plaintiff had a follow-up Zoom meeting with Advisor Ball, President Fishel, and Vice President Barta.

52.     At this second appeal meeting, Advisor Ball, with President Fishel and Vice President Barta as witnesses, informed Plaintiff that she and the officer team would be *reducing* Plaintiff's suspension to a conduct warning, with the stipulation that if Plaintiff made *anyone* feel

12

"uncomfortable" for *any* reason in the future, Plaintiff would be immediately and permanently banned from the Discord with no opportunity to appeal.

53.     Advisor Ball, with President Fishel and Vice President Barta as witnesses, clearly indicated that the reason for Plaintiff's warning was the same as the reason for his original suspension – i.e., Ms. Pratt's alleged "discomfort" with a nearly two-year-old private conversation that took place completely outside the context of the Computer Science Club at Pitt (thus placing it outside of the club's jurisdiction).

54.     Advisor Ball, with President Fishel and Vice President Barta as witnesses, also explicitly said that "all four" of Plaintiff, Mx. Simons, Mx. Hinson, and Ms. Pratt would be under "the same warning."

55.     CSC emailed Plaintiff a written copy of this warning, which informed Plaintiff that "[a]ny *further* misconduct is grounds for a permanent ban from the CSC Discord" (emphasis original), on September 8, 2023. Per Advisor Ball (with President Fishel and Vice President Barta as witnesses), "all four" of Plaintiff, Mx. Simons, Mx. Hinson, and Ms. Pratt were issued this "same warning."

56.     Later on September 8, 2023, the technological block on Plaintiff's membership in the CSC Discord server was lifted and Plaintiff was permitted to re-join the server.

57.     At 8:13PM Eastern Daylight Time (EDT) on September 9, 2023, while Plaintiff was responding to an uninvolved CSC member's concern and not engaging with any of Mx. Simons, Mx. Hinson, or Ms. Pratt, Mx. Hinson directly and unprovokedly insulted the male, cisgender Plaintiff as follows: "even the actual school of computing and information does not dick ride this hard for the school of computing and information."

58.    Mx. Hinson's sexually-charged and homophobic insult constituted a continuation of the bullying and harassment that began in June and suggests that their harassment of Plaintiff was at least in part motivated by what they perceived as homosexuality or lack of traditional masculinity on Plaintiff's part.

59.    Mx. Simons joined Mx. Hinson in insulting Plaintiff by reacting to one of Plaintiff's messages with a mocking and derogatory emoji, continuing Mx. Simon's own bullying and harassment of Plaintiff.

60.    Additionally, Mx. Simons reacted to Mx. Hinson's "dick rid[ing]" remark with an emoji indicating approval of and expressing agreement with Mx. Hinson's sentiment.

61.    Mx. Hinson and Mx. Simon's conduct thus violated Title IX of the Education Amendments of 1972, which prohibits discrimination "on the basis of sex."

62.    Mx. Hinson and Mx. Simons' conduct also violated CSC's code of conduct, which, in addition to requiring that all members "[b]e respectful" toward one another and noting that "disagreement is no excuse for poor behavior and poor manners," also requires that members "[b]e kind to others. Do not insult or put down other participants."

63.    Accordingly, in addition to violating Title IX, Mx. Hinson and Mx. Simons' conduct also violated CSC's code of conduct at least twice over.

64.    Per Advisor Ball (with President Fishel and Vice President Barta as witnesses) issuing "all four" of Plaintiff, Mx. Simons, Mx. Hinson, and Ms. Pratt conduct warnings on September 8, 2023 with the stipulation that "any further misconduct" would result in an immediate and permanent ban from the Discord, Mx. Hinson and Mx. Simons should therefore have been immediately and permanently banned from the Discord server for their continued bullying and harassment of Plaintiff.

65.    Plaintiff brought Mx. Hinson and Mx. Simons' conduct to the attention of President Fishel and Vice President Barta at 12:39AM EDT on September 10, 2023, as soon as Plaintiff saw their continued aggression towards him.

66.    Neither President Fishel nor Vice President Barta responded to Plaintiff or took any action against Mx. Hinson or Mx. Simons for their blatant misconduct.

67.    As a result of the mental and emotional distress he was experiencing from ongoing bullying, the CSC officers' inaction on said bullying, as well as unjustified disciplinary action from CSC itself, on September 11, 2023 Plaintiff was constructively forced to resign from a paid, part-time teaching assistant position that he held for the Fall 2023 semester, resulting in measurable financial loss.

68.    Unbeknownst to Plaintiff, this mid-semester resignation barred Plaintiff from being re-hired as a teaching assistant in subsequent semesters,[5] resulting in even *further* financial loss.

69.    Plaintiff followed up directly with President Fishel about Mx. Hinson and Mx. Simons' conduct on September 19, 2023, arguing that insultingly accusing someone of "dick rid[ing]" violates CSC's code of conduct and that Mx. Hinson and Mx. Simons should therefore be actioned per the terms of their conduct warning.

70.    President Fishel finally responded on September 19, 2023, more than a week after Plaintiff had first brought Mx. Hinson and Mx. Simon's conduct to his attention: "Frankly I don't think it's really that deep. Chris is just disagreeing with you in their crude way - It's definitely not the phrase I would've used but it's just them voicing their opinion as far as I personally see it."

---

[5] At this point, Plaintiff was the longest-serving undergraduate teaching assistant (UTA) in the University's computer science department, with seven consecutive semesters of highly-rated service under his belt. As such, notwithstanding his Fall 2023 resignation, Plaintiff was virtually guaranteed to have been re-hired as a UTA for the Spring 2024 semester (a position for which he applied and was rejected for the aforementioned procedural reason).

71.     In other words, President Fishel saw no issue with Mx. Hinson and Mx. Simons insultingly and sexistly accusing Plaintiff of "dick rid[ing]" (a concrete violation of both Title IX as well as CSC's code of conduct) in near real-time, but took severe issue with Plaintiff offering Ms. Pratt completely inoffensive and explicitly solicited advice completely outside the context of the club nearly two years earlier, indicating a clear double standard in how the club handles complaints of "discomfort" coming from male versus female club members.

72.     Indeed, this double standard is explicitly codified in CSC's code of conduct, which notes that "[o]ur community prioritizes marginalized people's safety over privileged people's comfort. We will not act on complaints regarding: 'Reverse' -.sms, including 'reverse racism', **'reverse sexism'**, and 'cisphobia'" (emphasis added).

73.     Given the officer team's inaction, Plaintiff escalated his concerns to Advisor Ball via email on September 25, 2023.

74.     Plaintiff also met in-person with a representative from SORC on September 25, 2023, where he suffered another emotional breakdown in front of the representative over the CSC leadership's unjust treatment of him and failure to act on Mx. Hinson and Mx. Simon's blatant misconduct, causing him to miss one of his classes that day.

75.     Advisor Ball did not respond to Plaintiff until October 18, 2023, when she said in an email to Plaintiff that she saw "no malice at all, no intent to inflict injury at all" in Mx. Hinson and Mx. Simons' objectively offensive conduct – despite the fact that she somehow saw intent to harass or cause "discomfort" in Plaintiff offering Ms. Pratt (whom Plaintiff at the time considered a friend) good faith, explicitly-solicited advice nearly two years earlier.

76.     Advisor Ball also accused Plaintiff of "searching for reasons to make this more than it is" and even suggested that the male Plaintiff take Mx. Hinson's "dick rid[ing]" remark as

a "compliment" – an outrageous statement that would have triggered serious Title IX scrutiny had Advisor Ball (who is currently the advisor for the Women in Computer Science Club at Pitt) made such a suggestion to a similarly situated *female* student.

77.    Given the continued inaction from both CSC's officer team as well as its advisor, Plaintiff met with the SORC representative a second time on October 24, 2023.

78.    After the SORC representative followed-up with Advisor Ball about Plaintiff's concerns, Advisor Ball finally sent Plaintiff an email on October 31, 2023 informing him that, as a result of their misconduct on September 9, 2023, Mx. Hinson and Mx. Simons had now been sent "the same" warning Plaintiff was sent on September 8, 2023.

79.    However, Advisor Ball (with President Fishel and Vice President Barta as witnesses) had, in his second appeal meeting on September 7, 2023, previously informed Plaintiff that "all four" of Plaintiff, Mx. Simons, Mx. Hinson, and Ms. Pratt were *already* under this "same warning."

80.    In other words, in response to their objectively offensive and sexist behavior on September 9, 2023, Mx. Hinson and Mx. Simons were given nothing but a conduct warning *that they had already been given.*

81.    As such, no net action was taken against Mx. Hinson and Mx. Simons, indicating deliberate indifference from CSC leadership towards the plight of Plaintiff and the sexually-charged harassment and bullying that he was facing.

82.    Finding this unsatisfactory, Plaintiff escalated the matter to the director of SORC, DaVaughn Vincent-Bryan ("Director").

83.    Plaintiff and Director Vincent-Bryan had a Zoom meeting on November 14, 2023, during which Plaintiff filled him in as to the details of the situation and requested that his *own*

conduct warning be lifted, since CSC leadership's had not produced any evidence of Plaintiff violating the club's code of conduct in any way.

84.    Director Vincent-Bryan did not get back to Plaintiff until January 3, 2024, when, after conferring with Advisor Ball, he falsely stated in an email that there had been an "argument" in the CSC Discord involving Plaintiff, Mx. Simons, Mx. Hinson, and Ms. Pratt in June of 2023.

85.    No such "argument" ever occurred, and Advisor Ball even conceded as much in an email to Plaintiff and Director Vincent-Bryan on February 26, 2024

86.    Director Vincent-Bryan also falsely stated that Advisor Ball clarified during Plaintiff's appeal meetings that his conduct warning was due to this nonexistent "argument" and not the October 27, 2021 conversation that Plaintiff had with Ms. Pratt completely outside the context of CSC, thus directly contradicting what Advisor Ball (with President Fishel and Vice President Barta as witnesses) told Plaintiff during Plaintiff's second appeal meeting on September 7, 2023.

87.    Upon information and belief, Advisor Ball attempted to deliberately mislead Director Vincent-Bryan about the reason for Plaintiff's conduct warning, in an attempt to make her *own* conduct seem more palatable and/or legitimate.

88.    Director Vincent-Bryan went on to say in the email that, based on these false "facts," he did "not find sufficient reason at this point" to lift Plaintiff's conduct warning, despite the complete lack of any evidence of wrongdoing on Plaintiff's part.

89.    Plaintiff responded to Director Vincent-Bryan the same day, pointing out (with screenshot evidence) the inaccuracies in Director Vincent-Bryan's understanding of the matter

and noting that neither Advisor Ball nor Director Vincent-Bryan had as yet produced any

evidence to justify Plaintiff's conduct warning.

90.    Despite this, Director Vincent-Bryan still refused to make any effort to ensure that

Plaintiff's unjust conduct warning was lifted.

91.    Furthermore, despite screenshot evidence of wrongdoing on the part of Mx.

Hinson and Mx. Simons, Director Vincent-Bryan refused to investigate further or take any

further action.

92.    In other words, Director Vincent-Bryan refused to carry out his duties as the

Director of SORC to ensure that CSC, as a Registered Student Organization at Pitt, abided by

both its own as well as the University's code of conduct.

93.    On June 25, 2024, Ms. Pratt continued the pattern of harassment and bullying

against Plaintiff that had begun a year earlier, with an unprovoked attack on Plaintiff while

Plaintiff was responding to a different CSC member in the CSC Discord server.

94.    On November 4, 2024, Plaintiff submitted a complaint against the Computer

Science Club at Pitt, Advisor Ball, and Vice President Barta[6] to the Title IX office, which

forwarded the complaint to the University of Pittsburgh Office of Compliance, Investigations

and Ethics.

95.    In the complaint, Plaintiff alleged gender discrimination with regards to how the

club handled the female Ms. Pratt's complaint of "discomfort" with a private conversation from

October 27, 2021 that took place completely outside the context of the club (i.e., immediately

suspending Plaintiff from the club's Discord server) versus how the club handled the male

Plaintiff's complaint of discomfort with Mx. Hinson and Mx. Simons publicly accusing him of

---

[6] President Fishel had since graduated from the University and was therefore outside the University's jurisdiction, which is why Plaintiff did not name him as a respondent in the complaint.

"dick rid[ing]" (which President Fishel said he didn't think was "that deep" and which Advisor

Ball suggested that Plaintiff take as a "compliment") publicly *within* the club.

96.    To reiterate, this gender discrimination is codified in the Computer Science

Club's code of conduct, which explicitly states that the club "will not act on complaints

regarding: 'Reverse' -isms, including 'reverse racism', 'reverse sexism', and 'cisphobia.'"

97.    Additionally, given Advisor Ball's past attempts to equivocate and/or mislead

about the reason for Plaintiff's conduct warning, on November 29, 2024, Plaintiff sent Advisor

Ball an email asking her to clarify, in writing, "on what grounds . . . [she] issue[d] [Plaintiff] a

conduct warning."

98.    Despite the fact that the November 29 email was not even addressed to him, on

December 3, 2024, Plaintiff instead received a reply from Donald Shields, SCI's Associate Dean

for External Relations Donald Shields and Advisor Ball's direct supervisor.

99.    In this December 3 email, Dean Shields stated that he had "directed Ms. Ball to

not reply to this or future messages about this subject" – thus depriving Plaintiff of the ability to

gain clarity about the reason for his conduct warning.

100.    Upon information and belief, Advisor Ball forwarded Plaintiff's email to Dean

Shields, who then intervened on Advisor Ball's behalf to deprive Plaintiff of his listeners' rights

under the First Amendment.

101.    Additionally, when Plaintiff requested to meet with Dean Shields in-person to

discuss his concerns about Advisor Ball – a University employee under Dean Shields' direct

supervision – Dean Shields flat-out refused to have such a meeting.

102.    Plaintiff met in-person with investigators from the Office of Compliance, Investigations and Ethics on January 16, 2025, where he provided them with more details about the relevant parties and facts.

103.    Plaintiff received an investigation outcome letter from the Title IX office via email on April 4, 2025.

104.    The outcome letter was signed by the University's then-Chief Diversity Officer and Vice Chancellor for Equity, Diversity, and Inclusion, Dr. Clyde Wilson Pickett ("Vice Chancellor"),[7] and CC'd to the Assistant Vice Chancellor of the CIE office, the Interim Deputy Title IX Coordinator, as well as the representative of the Title IX office to whom Plaintiff originally submitted his complaint.

105.    The outcome letter claimed that the CIE "conducted a thorough, neutral, fact-finding inquiry into [Plaintiff's] discriminatory harassment complaint."

106.    Despite this claim, the letter went on to say that "[t]he CIE Office confirmed that the only Respondent affiliated with the University is Nicholas Bartha [sic]," and that Vice President "Bartha" did not violate any University anti-discrimination policies.

107.    In other words, the CIE investigation *completely ignored* the Computer Science Club at Pitt and Advisor Ball (both of whom were and still are affiliated with the University) as Respondents and got the third Respondent's name wrong.

108.    Despite the egregiously incomplete nature of the investigation, the CIE dismissed Plaintiff's complaint with the stipulation that Plaintiff could appeal the dismissal to Vice Chancellor Pickett.

---

[7] Dr. Pickett's Vice Chancellor position has since been renamed to "Vice Chancellor for Institutional Engagement and Wellbeing," and he is no longer designated as the University's Chief Diversity Officer.

109.    Plaintiff emailed Vice Chancellor Pickett on April 5, 2025, indicating that he would like to appeal his complaint's dismissal on the grounds that the investigation completely ignored two of the three named Respondents.

110.    Vice Chancellor Pickett replied to Plaintiff via email on April 28, 2025, in which he notified Plaintiff that, "[a]fter completing a second review of the information, I have decided to uphold the dismissal of the complaint, as the alleged misconduct does not constitute a violation of the University's Nondiscrimination Policy" – despite the fact that CSC's code of conduct explicitly says that the club "will not act on complaints regarding: 'Reverse' -isms, including 'reverse racism', 'reverse sexism', and 'cisphobia.'"

111.    Vice Chancellor Pickett did not provide any details as to what his "second review of the information" entailed or provide any reasoning as to how he reached the conclusion that "the alleged misconduct does not constitute a violation of the University's Nondiscrimination Policy."

112.    Plaintiff replied to Vice Chancellor Pickett via email (with the Assistant Vice Chancellor of the CIE Office and the Interim Deputy Title IX Coordinator in CC) on May 1, 2025, asking for these details and arguing that, given the incomplete nature of the original investigation, he was entitled to a second investigation and outcome letter.

113.    Plaintiff received no reply from any Vice Chancellor Pickett, the CIE office, or the Title IX office.

114.    Plaintiff again reached out to Vice Chancellor Pickett via email (with the Assistant Vice Chancellor of the CIE Office and the Interim Deputy Title IX Coordinator in CC) on July 10, 2025, seeking further details about his complaint's dismissal and why two of the three named Respondents were not even investigated.

115.    To date, Plaintiff has not received a reply from any of Vice Chancellor Pickett, the CIE office, or the Title IX office regarding any of his requests for more information or demands for a more complete investigation.

## CAUSES OF ACTION

### COUNT I
### Violation of Title IX (20 U.S.C. § 1681)
### Against Defendant University of Pittsburgh

116.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

117.    Title IX stipulates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

118.    Under the standard set in *Davis v. Monroe County Board of Education*, an educational institution which receives federal funds can be held liable for monetary damages under Title IX when the institution has actual knowledge of sex-based harassment that occurs within its jurisdiction, acts with deliberate indifference towards that harassment, and the harassment is so severe, pervasive, and objectively offensive as to deprive a victim of access to educational opportunities or benefits.

119.    At all relevant times, the University of Pittsburgh was a recipient of "Federal financial assistance" and thus subject to Title IX.

120.    Mx. Hinson and Mx. Simons discriminated against the male Plaintiff on the basis of his sex by insultingly accusing him of "dick rid[ing]" as a direct and proximate result of what they perceived as homosexuality or lack of traditional masculinity on Plaintiff's part.

121.    Ms. Pratt also targeted Plaintiff because of his sex, explicitly describing her public harassment campaign against Plaintiff as being motivated by what she perceived as "the uncomfortable behaviors of a man" (i.e., Plaintiff).

122.    As such, sex-based harassment of Plaintiff occurred.

123.    This sex-based harassment occurred within the public CSC Discord server, an official arm of the Computer Science Club at Pitt.

124.    As a Registered Student Organization at Pitt, governed by democratically-elected student officers, a full-time faculty advisor, and bound by both the University's Student Code of Conduct as well as its Registered Student Organization Handbook, CSC is thus an environment where the university exercised substantial control over both the harassers and the context.

125.    Plaintiff informed both President Fishel and Advisor Ball of this sex-based harassment, thus imputing actual knowledge of the harassment to the University through Mr. Fishel and Ms. Ball's status as Responsible Employees and Mandatory Reporters under Title IX.

126.    Both President Fishel and Advisor Ball – and, by extension, the University – actively refused to intervene or take any corrective action with respect to the sex-based harassment, thus demonstrating deliberate indifference to Plaintiff's Title IX rights.

127.    This deliberate indifference was further compounded by Director Vincent-Bryan and Vice Chancellor Pickett's refusal to properly investigate the matter or take any sort of disciplinary action against the club or its leadership, evidencing a pattern of "reverse discrimination" in which the University and its agents systematically privilege and prioritize the complaints of women over the complaints of men.

128.    The harassment was so severe, pervasive, and objectively offensive as to deprive Plaintiff of educational benefits and opportunities to which he had a right as a full-time, degree-

seeking student at the university, including participating in the CSC Discord server or attending

in-person CSC events (which the sex-based harassment deterred Plaintiff from doing), attending

classes (which Plaintiff missed due to an emotional breakdown that he suffered as a result of the

sex-based harassment), and serving as a part-time teaching assistant for the School of Computing

and Information (a position from which Plaintiff was constructively forced to resign from and

subsequently barred from being re-hired for).

129.    Accordingly, all *Davis* criteria for institutional Title IX liability are met in

Plaintiff's case.

130.    As a direct and proximate result of Defendant University's violation of Plaintiff's

Title IX rights, Plaintiff has suffered substantial damages including but not limited to

humiliation, loss of reputation, embarrassment, inconvenience, loss of educational opportunities,

mental and emotional anguish and distress and other compensatory damages in an amount to be

determined by a jury at trial.

## COUNT II
**Violation of Equal Protection Under the Fourteenth Amendment Pursuant to 42 U.S.C. §§
1983, 1988
Against Defendants Computer Science Club at Pitt, Mackenzie Ball, and Clyde Pickett**

131.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

132.    The Fourteenth Amendment to the United States Constitution reads, in pertinent

part, "No State shall . . . deny to any person within its jurisdiction the equal protection of the

laws."

133.    By contrast, the Computer Science Club at Pitt's Code of Conduct reads, in

pertinent part: "Our community prioritizes marginalized people's safety over privileged people's

comfort. We will not act on complaints regarding: 'Reverse' -isms, including 'reverse racism', 'reverse sexism', and 'cisphobia.'"

134.    This unequal protection of CSC members was very clearly on display in how the club immediately suspended Plaintiff from the club because Ms. Pratt simply said that she felt "uncomfortable" with a nearly two-year-old private conversation that took place completely outside the context of the club, but summarily dismissed Plaintiff's concerns about insultingly (and publicly) being accused of "dick rid[ing]" *within* the context of the club.

135.    Indeed, President Fishel's claim that the "dick rid[ing]" remark was not "that deep" and Advisor Ball's accusation that Plaintiff was "searching for reasons to make this more than it is" – both acts which would have been treated very differently had Plaintiff been female – evidence clear intent to discriminate against Plaintiff on the grounds that, as a male, he should simply "suck it up" and put up with sex-based harassment that, if not for CSC's refusal to act on "reverse sexism," would otherwise have been dealt with very differently.

136.    Furthermore, Advisor Ball's suggestion that the male Plaintiff even take the "dick rid[ing]" insult as a "compliment" (which would have triggered serious consequences had Advisor Ball made the exact same suggestion to a similarly situated *female* student) elevated her conduct from mere deliberate indifference towards Plaintiff's Equal Protection rights to a malicious and reckless disregard for those rights.

137.    This sex discrimination was further compounded by Vice Chancellor Pickett positively asserting that the conduct of the club and its leadership "does not constitute a violation of the University's Nondiscrimination Policy" – which stipulates that "the University prohibits and will not engage in discrimination or harassment on the basis of race, color, religion, national origin, ancestry, sex, age, marital status, familial status, sexual orientation, gender identity and

expression, genetic information, disability, or status as a veteran – and refusing to properly investigate Plaintiff's claims or explain to Plaintiff by what process he came to his conclusion.

138.    As a direct and proximate result of Defendants' violation of Plaintiff's Fourteenth Amendment rights, Plaintiff has suffered substantial damages including but not limited to humiliation, loss of reputation, embarrassment, inconvenience, loss of educational opportunities, mental and emotional anguish and distress and other compensatory and punitive damages in an amount to be determined by a jury at trial.

## COUNT III
### First Amendment Retaliation Pursuant to 42 U.S.C. §§ 1983, 1988
### Against Defendants Computer Science Club at Pitt and Mackenzie Ball

139.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

140.    Under the First Amendment to the United States Constitution, Plaintiff has the right to engage in free speech.

141.    Plaintiff's private conversation with Ms. Pratt that took place completely outside the context of the club on October 27, 2021 – in which Plaintiff gave Ms. Pratt explicitly-solicited, good-faith advice – was objectively inoffensive and thus a textbook exercise of constitutionally-protected free speech.

142.    *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. *en banc* 1999), *et al.* establish that when a government actor takes adverse or disciplinary action against a private citizen for engaging in protected speech that would have a chilling effect on or otherwise deter a person of ordinary firmness from engaging in such speech, this constitutes illegal First Amendment retaliation.

143.    CSC, when disciplining members within its official club spaces, is doing so as a state actor because its authority to discipline its members stems from its status as a Registered Student Organization at Pitt, itself an arm of the state of Pennsylvania and a state actor.[8]

144.    CSC's Discord server constitutes an official club space not only because it meaningfully contributes to CSC's mission "[t]o help create an engaging atmosphere for students to learn more about the field of computer science and develop professionally" in ways that are not replicated in the club's in-person events, but also because "communication on social media platforms" is explicitly identified in the club's constitution as a means of obtaining membership in the club and because the Discord server is advertised at the club's in-person, on-campus events, on the club's public website and social media profiles (which tout the club's status as a Registered Student Organization at Pitt), and in the club's weekly newsletter.

145.    Being suspended from club spaces or given a conduct warning for objectively inoffensive speech that in no way violates the Club or University's Code of Conduct is sufficient to reasonably deter a person of ordinary firmness from engaging in such speech (in this case, giving explicitly-solicited advice to a friend), thus leading to a chilling or suppressing effect on constitutionally-protected speech.

---

[8] That the Computer Science Club at Pitt's authority to control access to its spaces and discipline its members stems from the University of Pittsburgh as a state actor (and that CSC and its advisor Mackenzie Ball were therefore acting under color of state law when they disciplined Plaintiff) is reinforced by an incident that Plaintiff had with the Ballroom Dance Club at Pitt ("BDC"), which Plaintiff was also a member of during his time as an undergraduate student at Pitt.

Unbeknownst to Plaintiff, who joined BDC in August of 2022, the BDC had changed its rules at the beginning of the 2024-2025 academic year to no longer allow alumni or community members to attend its events. Unaware of this recent rule change, Plaintiff, who had seen alumni and community members at many prior BDC events, attempted to attend one of the BDC's in-person events in March 2025. When he tried to do so, he was told by the BDC officers that he had to leave and subsequently received an email from a full-time University employee informing him that "moving forward, please refrain from attempts to attend club activities as this could eventually lead to further action being taken" under color of state law.

146.    Accordingly, when CSC suspended Plaintiff from its Discord server on August 24, 2023 because of Ms. Pratt's alleged "discomfort" with the private October 27, 2021 conversation between Plaintiff and Ms. Pratt, it engaged in unlawful First Amendment retaliation.

147.    Advisor Ball became another perpetrator of First Amendment retaliation when, on September 8, 2023, she and the CSC officers jointly issued Plaintiff a conduct warning which stipulated that "[a]ny further misconduct is grounds for a permanent ban from the CSC Discord."

148.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered substantial damages including but not limited to humiliation, loss of reputation, embarrassment, inconvenience, loss of educational opportunities, mental and emotional anguish and distress and other compensatory and punitive damages in an amount to be determined by a jury at trial.

**COUNT IV**
**Violation of Listeners' Rights Under the First Amendment Pursuant to 42 U.S.C. §§**
**1983, 1988**
**Against Defendant Computer Science Club at Pitt**

149.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

150.    *Stanley v. Georgia*, 394 U.S. 557 (1969), *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969), *Board of Education v. Pico*, 457 U.S. 853 (1982), *et al.* establish that the First Amendment protects not only the right to *express* ideas and opinions (speakers' rights), but also the right to *receive* information and ideas and to hear competing viewpoints (listeners' rights).

151.    In unlawfully suspending Plaintiff from the CSC Discord server in the absence of any actual misconduct on Plaintiff's part, the CSC leadership deprived Plaintiff of his right to receive information and ideas that were being exchanged in the Discord server and not replicated

elsewhere, including certain club announcements, leads on jobs and other postgraduate or research opportunities, and other discussions related to CSC's mission of "help[ing] . . . students to learn more about the field of computer science and develop professionally."

152.    CSC also deprived Plaintiff of his right to hear competing viewpoints on certain matters that were discussed within the club.

153.    Additionally, given that Plaintiff was a high-achieving Honors student who had taken a very broad range of courses, a part-time teaching assistant, and an active member of the CSC community who took a particular interest in answering academics-related questions from other club members, the CSC leadership also deprived *other club members* of their rights to hear Plaintiff's thoughts and opinions, including his potentially "competing viewpoints" on certain matters.

154.    As a direct and proximate result of Defendant CSC's unlawful suspension of Plaintiff (which the club explicitly informed Ms. Pratt of and which then spread throughout the rest of the CSC community), Plaintiff suffered substantial damages including but not limited to humiliation, loss of reputation, embarrassment, inconvenience, loss of educational opportunities, mental and emotional anguish and distress and other compensatory and punitive damages in an amount to be determined by a jury at trial.

## COUNT V
### Violation of Listeners' Rights Under the First Amendment Pursuant to 42 U.S.C. §§ 1983, 1988
### Against Defendant Donald Shields

155.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

156.    Although Advisor Ball initially indicated that the reason for the conduct warning that she and the CSC officers issued Plaintiff on September 8, 2023 was the October 27, 2021 conversation that Plaintiff privately had with Ms. Pratt completely outside the context of the

club, Advisor Ball later attempted to equivocate and/or mislead about the reason for Plaintiff's

warning once she began facing third-party scrutiny from SORC and other University authorities,

including vaguely suggesting that the warning was instead for an unspecified and unsubstantiated

"argument" that allegedly took place within the club (but never actually did).

157.    Given these attempts to mislead on Advisor Ball's part, on November 29, 2024,

Plaintiff sent Advisor Ball an email asking her to clarify, in writing, what the reason for his

conduct warning was.

158.    Despite the fact that this email was not even addressed to Dean Shields, Plaintiff

received a reply from Dean Shields on December 3, 2024, in which Dean Shields stated that he

had "directed Ms. Ball to not reply to this or future messages about this subject."

159.    Dean Shields thus violated Plaintiff's listeners' rights to gain clarity about the

supposed reason for his conduct warning, which *itself* violated the First Amendment and caused

Plaintiff substantial distress.

160.    As a direct and proximate result of Defendant Shields' unlawful conduct, Plaintiff

suffered substantial damages including but not inconvenience, loss of educational opportunities,

mental and emotional anguish and distress and other compensatory and punitive damages in an

amount to be determined by a jury at trial.

## COUNT VI
### Intentional Infliction of Emotional Distress
### Against Defendants Camryn Simons, Christopher Hinson, Madeline Pratt, and Mackenzie Ball

161.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

162.    Mx. Simons and Mx. Hinson, both of whom had a long history of misconduct in

CSC began unprovokedly bullying Plaintiff beginning in June of 2023.

163.    Ms. Pratt joined Mx. Simons and Mx. Hinson in bullying Plaintiff beginning in June of 2023.

164.    Mx. Hinson and Mx. Simons continued bullying Plaintiff into at least September 2023, and Ms. Pratt continued bullying Plaintiff into at least June 2024.

165.    As a result of Defendant Simons, Hinson, and Pratt's conduct towards Plaintiff, Plaintiff suffered at least two mental and emotional breakdowns, one of which led to a psychiatric evaluation and the initiation of psychiatric treatment and both of which deprived Plaintiff of access to educational benefits and opportunities.

166.    Additionally, during his first appeal meeting with Advisor Ball and Vice President Barta on August 30, 2023, Advisor Ball manifested an incredibly rude and callous attitude towards Plaintiff.

167.    Furthermore, when Plaintiff brought Mx. Hinson and Mx. Simon's objectively offensive accusation of "dick rid[ing]" to Advisor Ball's attention, she blithely questioned why Plaintiff "ke[pt] searching for reasons to make this more than it is," suggested that Plaintiff take the insult as a "compliment," and inappropriately lectured Plaintiff that "the club discord is to discuss club items and events and connect with members, keep its use to those purposes" – outrageous conduct that not only shirked Advisor Ball's professional responsibilities, but also displayed blatant contempt and disregard for Plaintiff's humanity.

168.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial damages including but not limited to humiliation, loss of reputation, embarrassment, inconvenience, loss of educational opportunities, mental and emotional anguish and distress and other compensatory and punitive damages in an amount to be determined by a jury at trial.

## COUNT VII
### Negligent Infliction of Emotional Distress
### Against Defendants Robert Fishel, Mackenzie Ball, DaVaughn Vincent-Bryan,
### Donald Shields, and Clyde Pickett

169.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

170.    As the democratically elected president of CSC, Mr. Fishel had a duty to uphold both CSC's and the University's Code of Conduct, which not only prohibit all forms of harassment, but particularly highlight discrimination on the basis of sex, gender, and similar characteristics.

171.    Accordingly, Mr. Fishel had a special duty to Plaintiff to protect Plaintiff from sex-based harassment and discrimination in his capacity as President of CSC.

172.    However, when Plaintiff brought Mx. Hinson and Mx. Simons' sexually-charged harassment of him on September 9, 2023, to Mr. Fishel's attention, President Fishel shrugged it off and said it wasn't "that deep" – despite the fact that President Fishel saw reason to suspend Plaintiff from the CSC Discord for a nearly two-year-old private conversation that was explicitly solicited and objectively inoffensive.

173.    Accordingly, President Fishel breached his duty of care to Plaintiff in his capacity as president of CSC.

174.    Additionally, in failing to elevate Plaintiff's concerns about sex-based harassment to the University's Title IX office, President Fishel also breached his duties as a Responsible Employee and Mandatory Reporter under Title IX, which derived from President Fishel's employment as a Peer Tutor for the University of Pittsburgh's School of Computing and Information.

175.     Advisor Ball, who had a duty to ensure that CSC abided by its own as well as the University's code of conduct, also breached this duty in failing to take any action on sex-based harassment that was reported to her.

176.     Advisor Ball, as a full-time staff member of the University, also breached her duties as a Responsible Employee and Mandatory Reporter under Title IX, in failing to elevate Plaintiff's concerns about Mx. Hinson's "dick rid[ing]" insult to the University's Title IX office (and even going as far as to suggest that the male plaintiff take the remark as a "compliment").

177.     These breaches of President Fishel and Advisor Ball's duty of care to Plaintiff directly contributed to Plaintiff's constructive resignation from a part-time teaching assistant position that he held, resulting in measurable financial loss.

178.     Director Vincent-Bryan, as the Director of SORC, had a duty to ensure that all Registered Student Organizations at Pitt abide by not only their own and the University's codes of conduct, but also by the Registered Student Organization Handbook, which requires that all RSOs "[a]dhere to University policies and procedures and local, state and federal laws" and notes that "[a]ny violation of this Handbook may result in disciplinary action in accordance with the Student Code of Conduct."

179.     However, when Plaintiff escalated his concerns to him, Director Vincent-Bryan declined to properly investigate or take appropriate action against CSC or its advisor, thus breaching his duties as Director of SORC.

180.     Dean Shields, as an Associate Dean for the University of Pittsburgh's School of Computing and Information ("SCI"), has a duty to ensure that all SCI students are able to access the full educational opportunities and benefits associated with enrollment in SCI.

34

181.    However, when Plaintiff inquired to Advisor Ball about the reason for his unlawful conduct warning, Dean Shields replied to Plaintiff saying that he had "directed Ms. Ball to not reply to this or future messages about this subject" – thus depriving Plaintiff of the ability to gain clarity about the reason for a conduct warning that chilled and deterred Plaintiff from fully participating in CSC and obtaining the concomitant educational benefits.

182.    Dean Shields thus breached his duty to ensure that SCI students have full access to the educational opportunities and benefits associated with SCI enrollment.

183.    Additionally, Dean Shields also flat-out refused to meet with Plaintiff in-person to discuss his concerns about Advisor Ball's conduct and decision-making, further shirking his duty to hold Advisor Ball (a direct supervisee of Dean Shields) accountable for her actions.

184.    Vice Chancellor Pickett, as the University's then-Vice Chancellor for Equity, Diversity, and Inclusion and Chief Diversity Officer, had a duty to ensure that no type of gender- or sex-based discrimination or other violation of the University's Nondiscrimination Policy took place within the University's jurisdiction.

185.    However, Vice Chancellor Pickett declined to properly investigate or take any action regarding the gender discrimination complaint that Plaintiff filed with the University's Office of Compliance, Investigations, and Ethics, even positively asserting that the conduct of CSC and its leadership "does not constitute a violation of the University's Nondiscrimination Policy" – despite the fact that the Computer Science Club at Pitt's code of conduct explicitly states that the club "will not act on complaints regarding: 'Reverse' -isms, including 'reverse racism', 'reverse sexism', and 'cisphobia.'"

186.    In failing to act Plaintiff's reverse discrimination claim, Vice Chancellor Pickett thus breached his duties as the University's then-Vice Chancellor for Equity, Diversity, and Inclusion and Chief Diversity Officer.

187.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial damages including but not limited to humiliation, loss of reputation, embarrassment, inconvenience, loss of educational opportunities, mental and emotional anguish and distress and other compensatory and punitive damages in an amount to be determined by a jury at trial.

## REQUESTED RELIEF

WHEREFORE, Plaintiff, requests judgement against Defendants as follows:

A. For appropriate declaratory and injunctive relief regarding the unlawful and unconstitutional acts and practices of Defendants;

B. For appropriate compensatory and punitive damages in an amount to be determined at trial;

C. For such other and further relief to which Plaintiff may show himself justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all causes of action and issues so triable.

Dated: December 5, 2025                          Respectfully submitted,

                                                 /s/ John Doe
                                                 John Doe (pro se)
                                                 Address on file with the Court
                                                 Telephone: On file with the Court
                                                 Email: On file with the Court